FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 DEC 24   PM 12: 52

CLERK'S OFFICE
AT BALTIMORE

BY_____ _____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID           MICHAEL
MONTGOMERY,

  *Plaintiff*,

v.

CONMED, INC.,

  *Defendant*.

**Under Seal**[1]

Civil Action No.: ELH-13-00930

## MEMORANDUM OPINION

David Michael Montgomery, an inmate within the Maryland Division of Correction, filed

suit in March 2013 against a host of defendants, pursuant to 42 U.S.C. § 1983. The defendants

included a health care provider, members of the Anne Arundel County Police Department, and

members of the Maryland State Police, as well as the police departments. The suit, which was

later amended and then supplemented, is rooted in Montgomery's arrest on January 5, 2013, and

his subsequent detention at the Carroll County Detention Center (the "Facility" or "Detention

---

[1] By Order of December 15, 2015 (ECF 143), I advised counsel that, in writing this
Memorandum, I may need to refer to Conmed's Policy and Procedures Manual (ECF 132-4),
which was filed under seal. Therefore, I asked counsel to advise the Court whether they had any
objection to the Court's reference to sealed material. On December 17, 2015, defense counsel
notified the Court of its objection, stating: "Conmed objects to the Court's reference to the sealed
materials in a written opinion on the basis that such materials are proprietary and contain trade
secrets." ECF 144 at 1.

   In my view, it is necessary for the Court to consider Conmed's Policy and Procedures
Manual (ECF 132-4). Accordingly, I have filed this Memorandum under seal. After the
docketing of this opinion, counsel are directed to submit proposed redactions to the opinion so
that a public, redacted version may be released. *See also* ECF 145, Order of Dec. 22, 2015.

Center"). *See* ECF 1; ECF 7; ECF 12.[2]  As relief, Montgomery requested $1 million; a lesser sentence in a Maryland criminal case;[3] and to have "the officers fired." ECF 7 at 13; ECF 12 at 13.

At the time suit was filed, Montgomery was self-represented.  But, in February 2014, the Court appointed counsel for plaintiff.  He has been represented since that time.

Earlier in the litigation, motions to dismiss or, in the alternative, for summary judgment were filed by defendants Conmed, Inc. ("Conmed"),[4] the private medical provider for the Facility.  ECF 21.  In addition, a dispositive motion was filed by Anne Arundel County police officers Sergeant Michael Galligan; Corporal Scott Pedersen;[5] Patrolman First Class K. J. Jenkins; Corporal Jamie Grover; as well as the Anne Arundel County Police Department (the "AACPD Defendants").  ECF 28.  Warden Hardinger of the Detention Center also filed a

---

[2] In his suit, plaintiff referred to the Facility as the Carroll County Jail. *See* ECF 1.

[3] On December 30, 2013, in the Circuit Court for Carroll County, Criminal Case No. 06-K-13-043713, Montgomery pleaded guilty to second-degree murder and armed robbery/attempted armed robbery, pursuant to an agreed statement of facts. He was sentenced to a total of thirty years of incarceration. Case Information, Maryland Judiciary Case Search (last visited Dec. 9, 2015) http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=06K13043713&loc=61 &detailLoc=K.

[4] The parties' submissions provide inconsistent names and spellings for Conmed. Defendant's Motion for Summary Judgment, for example, identifies defendant as "ConMed, Inc." ECF 128 at 1.  Defendant's supporting memorandum identifies defendant as "Conmed." ECF 128-1 at 20.  The Policy and Procedures Manual for the Detention Center, which Montgomery appended to his Opposition (ECF 132), identifies defendant as "Conmed Healthcare Management, Inc." ECF 132-4 at 1.  I will refer to defendant as "Conmed."

[5] Defendant's last name was misspelled as "Paderson" in the Complaint.  ECF 1 and 12. The docket was subsequently corrected to reflect the spelling of "Pederson."  However, according to ECF 28, the dispositive motion of certain defendants (ECF 28), and a supporting affidavit filed by Pedersen (ECF 28-2), the correct spelling is "Pedersen."

dispositive motion. ECF 34.[6]   And, the Maryland State Police, along with Corporal Jason Bigham; Trooper Christopher Bishop; Sergeant John Carhart; Senior Trooper Jeffrey B. Claycomb; Sergeant Edward Eicher; Senior Trooper Frank Fornoff;[7] Trooper Christopher Taylor; and Senior Trooper Edward Winkler (the "MSP Defendants") filed a motion to dismiss or for summary judgment. ECF 36.

By Memorandum Opinion (ECF 48) and Order (ECF 49) of February 12, 2014, I construed the motions of the AACPD Defendants, the MSP Defendants, and Warden Hardinger (ECF 28, 34, 36) as motions for summary judgment and granted them. But, I denied Conmed's motion (ECF 21). ECF 48, Memo; ECF 49, Order. And, I appointed counsel for Montgomery. ECF 49, Order of Feb. 12, 2014; ECF 50, Order of Feb. 19, 2014.[8]

---

[6] Counsel entered an appearance on behalf of Warden Hardinger and the Detention Center, but the motion addressed claims only as to Hardinger. Nevertheless, the Detention Center was dismissed from this case because it is not a "person" subject to suit under 42 U.S.C. § 1983. *See, e.g., Marsden v. Fed. Bureau of Prisons*, 856 F. Supp. 832, 836 (S.D.N.Y. 1994) ("jail is not an entity that is amenable to suit"); *Powell v. Cook County Jail*, 814 F. Supp. 757 (N.D. Ill. 1993) (jail not subject to suit). Similarly, Montgomery's claim against the "State Police Westminster" was dismissed, because the "State Police Westminster" is not a "person" subject to suit under 42 U.S.C. § 1983. *See, e.g., Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989); *Marsden*, 856 F. Supp. at 836; *Powell*, 814 F. Supp. at 757.

[7] Defendant's name was misspelled as "Fornoss" in the Complaint. ECF 1 at 1. I have used the spelling that appears in the defense motion at ECF 36.

[8] Montgomery expressed dissatisfaction with the legal representation provided by his first pro bono counsel. ECF 70, Letter to the Court docketed Sept. 24, 2015; ECF 72, Letter to Court docketed Oct. 6, 2014; ECF 73 at 5-7, Letter to the Court docketed Oct. 8, 2014; ECF 74, Letter to the Court docketed Oct. 8, 2014; ECF 75, Letter to the Court docketed Oct. 8, 2014. On October 10, 2014, Montgomery's first attorney filed a Motion to Withdraw Appearance and Request for Stay of Current Deadlines. ECF 76. I held that motion in abeyance, pending the Court's receipt of a status report (ECF 77, Order of Oct. 10, 2014) and the attorney's receipt of an outstanding discovery response. ECF 82, Order of Oct. 30, 2014. By Order of November 12, 2014, I appointed Heather B. Nelson, Esquire, as Montgomery's pro bono counsel (ECF 85) and granted the prior attorney's motion to withdraw by Order of November 12, 2014. ECF 86.

Thereafter, the remaining parties, Montgomery and Conmed, engaged in discovery, which concluded on August 21, 2015.[9] ECF 124 at 1, Status Report of Aug. 21, 2015. Neither party has designated an expert witness. *Id.* Nor has the Court been provided with excerpts of any depositions.[10]

On October 18, 2015, Conmed filed a Motion to Summary Judgment pursuant to Fed. R. Civ. P. 56 (ECF 128), accompanied by a Memorandum of Law. ECF 128-1, Memo (collectively the "Motion"). The Motion is supported by two exhibits. ECF 128-2; ECF 128-3. Montgomery opposes the Motion. ECF 132, Opposition; ECF 132-1, Memo (collectively "Opposition"). He submitted three exhibits with his Opposition. ECF 132-2 to ECF 132-4.[11] Conmed has replied. ECF 138.

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.[12]

---

[9] I granted several consent motions to extend discovery deadlines. *See, e.g.,* ECF 91, Order of Dec. 12, 2014; ECF 107, Consent Motion to Modify Scheduling Order; ECF 108, Order of Apr. 8, 2015; ECF 116, Status Report of May 22, 2015 (discussing difficulties scheduling the deposition of Montgomery's proposed expert witness); ECF 122, Order of June 12, 2015.

[10] As discussed, *infra*, Montgomery has not designated an expert. However, the Court twice authorized payment of fees for his expert witnesses. *See* ECF 103, ECF 104, ECF 105, ECF 115, ECF 120, and ECF 123. Although the Court anticipated that Conmed would present an expert witness, I am satisfied, as discussed, *infra*, that its failure to produce an expert does not preclude the award of summary judgment to Conmed.

[11] Montgomery also filed his own two-page handwritten submission opposing Conmed's Motion, which the Clerk docketed on November 4, 2015. ECF 135.

[12] Montgomery's attorney filed an "Interim Sealing Motion" (ECF 131) as to his Opposition. ECF 132. By Order of October 27, 2015, I denied the Interim Sealing Motion, without prejudice. ECF 133. Thereafter, Montgomery's attorney filed a Renewed Interim Sealing Motion, ECF 139, in which substantial modifications were made to the request to seal. I granted ECF 139 by Order of November 17, 2015. ECF 142. Pursuant to that Order,

## I. Factual Background[13]

Montgomery was born in 1984.  ECF 128-2 at 6.  He states that he has battled mental illness for more than a decade.  *See* ECF 128-3 at 11, Montgomery Interrogatory Answers.  "In or about November 2012, he was diagnosed with bipolar disorder, ADHD,[14] and drug dependency."  *Id.*   That month, he received prescriptions for Adderall, Lithium,[15] and Amitriptyline "for his mental health issues," which were renewed in December 2012.  *Id.* at 12.  "Montgomery recalls that he last took his prescribed Lithium dosage on or about either January 3 or 4, 2013."  *Id.* at 6.

Montgomery was arrested by the Anne Arundel County Police sometime after 12:18 p.m. on Saturday, January 5, 2013.  ECF 1 at 2, Complaint.  He was transferred to a Maryland State Police barracks and ultimately to the Carroll County Detention Center, where he arrived later on January 5, 2013.  *Id.*  According to Montgomery, he was "very high and drunk" when he arrived at the Facility.  *Id.* at 3.

---

Montgomery's attorney submitted a partially redacted Opposition (ECF 141), Memorandum of Law (ECF 141-1), and accompanying exhibits.  ECF 141-2 to ECF 141-4.

[13] I also incorporate here the factual summary set forth in my Memorandum of February 12, 2014.  ECF 48.

[14] Under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Therefore, I shall take notice of the fact that "ADHD" refers to Attention-Deficit / Hyperactivity Disorder.  *See* Facts about ADHD, Centers for Disease Control and Prevention, http://www.cdc.gov/ncbddd/adhd/facts.html (last visited Dec. 2, 2015).

[15] Lithium carbonate is a generic name for a prescription medication used to treat "manic depressive illness."  Physicians' Desk Reference 1485 (59th ed. 2005).

Of relevance here, Montgomery claims that the medical treatment he received at the Detention Center was constitutionally inadequate. He faults the Facility's "medical department" for failing to recognize and treat his drug withdrawal from "crack," "dope," "weed," "meth," "K-2,"[16] and alcohol. ECF 1 at 2-3. Montgomery complains that, despite his withdrawal symptoms, he was not provided with any medication to alleviate the pain caused by withdrawal. *Id.* at 2-3. According to Montgomery, by January 6 or January 7 of 2013, he had attempted suicide three times while in his jail cell, due to deficiencies in his medical care. *Id.* at 3. In this regard, he asserts that he tried hanging himself twice and once jumped down from the top bunk, head first. *Id.*

Plaintiff also alleges that he received inadequate care for bipolar disorder, ADHD, and insomnia, noting he was on medically prescribed Lithium and Adderall at the time of his arrest. *Id.* at 2. In addition, Montgomery asserts that he told everyone involved in his arrest and ensuing events that he was in need of medical care. *Id.* at 2-4. And, Montgomery seems to state that his suicide attempts exacerbated his pain from injuries sustained in a motor vehicle crash that occurred in 2008. *Id.* at 4.

In the Complaint, Montgomery alleges that one month elapsed before Montgomery was given his prescribed medications at the Detention Center. *Id.* at 2-3. But, in his Opposition, Montgomery seems to have modified this contention. ECF 141-1 at 4 ("Only days after [his alleged suicide attempt] did Montgomery finally receive his prescribed [L]ithium."). In his Opposition Memo, Montgomery summarizes his claim: "The essence of [his] claim against

---

[16] "K2" is a "trade name[]" for a synthetic designer drug that "mimic[s]" "the main active ingredient of marijuana." Drug Enforcement Administration, *Drugs of Abuse* 64 (2015), http://www.dea.gov/pr/multimedia-library/publications/drug_of_abuse.pdf#page=64.

ConMed is that ConMed failed to promptly administer necessary medication and failed to adequately treat symptoms of withdrawal, and this failure led to Montgomery's suicide attempts on January 7, 2013, all in violation of his constitutional rights." *Id.* at 3.

As noted, Conmed provides health care services to detainees in the Detention Center. ECF 132-3, Services Agreement. Montgomery has attached to his Opposition excerpts from the Conmed Health Management Policy and Procedures Manual for the Detention Center (the "Manual"). ECF 132-4. The Manual provides, *id.* at 20 ¶ 1:

According to the Manual, *id.* at 20 ¶ 2:

The Manual outlines procedures for treating inmates who report that they are taking prescription medication at the time of incarceration. It says, ECF 132-4 at 9 ¶¶ 2-3:



The Manual includes guidelines for treating inmates who report a prescription for psychotropic medication. It provides, in relevant part, *id.* at 10 ¶ 7 (emphasis in original):





The Manual also states, ECF 132-4 at 10 ¶ 4: "Inmates ██████████████ previously prescribed psychotropic medications will not be automatically started on these medications ██████████████████████████████ In addition, for newly incarcerated inmates for whom ██████████████████████████ ██████████████████████████ (*id.* at 10 ¶ 3), a "Bridge Order" (*id.* at 10 ¶ 2) to continue the medication may be issued ██████████████████████ *Id.* at 10 ¶ 3. According to the Manual, "on-call" clinicians are available to issue "[m]edication/bridge medication orders" ██████████ ██████████ *Id.* at 4 ¶ 6. Clinicians are available after hours to address "[n]ew medical problem[s] that *require[] intervention prior to the next shift*," including "[a]n inmate's serious injury or self injury" or "[a]n attempted or successful suicide." *Id.* at 5 ¶ 7 (emphasis in original).

Further, the Manual provides ███████████████████
███████████████████████████████████████████████

drugs." ECF 132-4 at 26. According to the Manual, ███████████
███████████████████ (*id.* at 26 ¶ 1), or inmates whose ███████████

███████████████████ are to be transferred to a hospital. *Id.* at 26 ¶ 5. Inmates who

undergo detoxification at the Detention Center are to do so "under medical supervision." *Id.* at

26 ¶ 3. The Manual specifies, *id.* at 26 ¶ 2 (Procedures Section): ███████████
███████████████████████████████████████████████
████████████████████████████████████████ It permits

Conmed's staff to ███████████████████████████████████
███████████████████████████████████████████████

███████ *Id.* at 26 ¶ 1 (Procedures Section).

In addition, the Manual sets out guidelines for the "Management of Potentially Suicidal

Inmates." *Id.* at 24-25. It states, *id.* at 24 ¶ 1: ███████████████████
███████████████████████████████████████████████

███████████████████████████ It also provides, *id.* at 24 ¶ 2: "Precaution

procedures will be implemented ███████████████████████████

███████ The Manual suggests that "[p]recaution procedures" include "Suicide Watch," ███
███████████████████████████████████████████████

███████ *Id.* It states, *id.* at 24 ¶ 3: "Mental health evaluation will determine the subsequent

actions needed ███████████████████████████████████████

9

██████████████████████████████ According to the Manual, *id.* at 25 ¶ 5: "Only a qualified ███████ Professional is able to clear an inmate from Suicide Watch."

Conmed has also submitted over 70 pages of Montgomery's medical records concerning medical treatment that plaintiff received while at the Detention Center. ECF 128-2. According to Conmed, the records show that "Montgomery was prescribed Lithium and was given the same beginning on January 9, 2013, just three days after he was incarcerated." ECF 128-1 at 8, Memo.

As noted, plaintiff arrived at the Detention Center no earlier than the afternoon of January 5, 2013. Plaintiff's medical records reveal that within a matter of hours—between 9:45 p.m. and 9:55 p.m. on January 5, 2013—Montgomery received a medical screening from a corrections officer named Ackerman.[17] ECF 128-2 at 6-7. The "Carroll County Detention Center Medical Screening Form" ("Medical Screening Form") indicates that Montgomery was "alert," "Calm," and "Cooperative." *Id.* at 7. Ackerman categorized Montgomery's "Mood" as "normal." *Id.*

According to the Medical Screening Form, Montgomery had informed a "Nurse / Doctor" named Melissa of "problems, daily medicine, or history of illness" at 7:25 p.m. on January 5, 2015. *Id.* at 7. The Medical Screening Form included the following question: "Are you taking medication for diabetes, heart problems, asthma, high blood pressure, mental health, or any other condition?" *Id.* at 6. Ackerman circled the answer "Yes." *Id.* With regard to this question, Ackerman noted, *id.* at 7: "Takes Aderol [sic] 30 mg / 2x day / Lithium 450 mg / Methadone 30 / mg / Amatripiline [sic] 100 mg / Claritin & Acid Reflux Medicine."

---

[17] The Intake Officer's signature is partially illegible. ECF 128-2 at 7.

The first page of the Medical Screening Form asked: "Is the inmate showing signs of illness, injury, bleeding, pain suggestions or the need for immediate need for medical referral?" *Id.* at 6. Ackerman circled the answer "No." *Id.* It also asked: "Have you attempted suicide within the past 2 yrs / Do you have suicidal thoughts right now." *Id.* Ackerman again circled the answer "No." *Id.*

The second page of the Medical Screening Form is titled "Behavioral Observations." It required the intake officer to address the inmate's "Level of Awareness;" "General Behavior;" "Mood;" and "Perceptions / Thoughts." *Id.* at 7. In the section as to "Perceptions / Thoughts," the screener must respond to questions concerning whether the defendant is "hearing voices," "not making any sense," and / or "responding to unseen things." *Id.* Ackerman indicated normal results in all categories. *Id.*

This portion of the form also included a cautionary section labeled "Triggers for Suicide Watch" and "Triggers for Close Watch." Under "Triggers for Suicide Watch," the form states: "Currently Suicidal," "recent history (2 yrs) of actual attempt," and "Failure to maintain control of or dangerous behavior on close watch." *Id.* Under "Triggers for Close Watch," it states: "Emotionally distraught and <u>unable</u> to regain composure by end of Intake process" and "Actively hallucinating, disorganized behavior or not aware of surroundings." *Id.* (underlined in original).

In addition, the "Behavioral Observations" section of the Medical Screening Form asked the following questions concerning suicide, *id.*:

    5a. Is there a history of actual suicide attempt?
    5b. Does the inmate describe current suicidal thoughts?
    5c. Is there any physical evidence of self-mutilation?
    5d. Is the inmate unable to control behavior?

Ackerman answered "No" to each of these questions. *Id.*

11

The "Behavioral Observations" section of the Medical Screening Form also contained questions pertaining to "Substance Abuse." *Id.* Ackerman checked "Yes" to the question asking if Montgomery had a "History of drug or alcohol abuse" and wrote that plaintiff required a "Methadone Program." *Id.* In the "Remarks," Ackerman wrote "Uses Heroin – Last Use Yesterday." *Id.*

The Medical Screen Form also asked if the inmate presents "Behavior consistent with intoxication," or symptoms including "tremor / shaking," "sweating," "diarrhea," "back pain," "confusion / disorientation," "picking at self / reaching for things not there," and "seizure activity." *Id.* Ackerman answered "No" to the question of whether Montgomery's behavior was consistent with intoxication. And, Ackerman did not note any of the above mentioned symptoms. *Id.* Notably, the form instructed the intake officer: "If inmate appears to be withdrawing from drugs or alcohol of if more than one box checked [for the symptoms presented above] notify medical provider." *Id.*

At 1:00 a.m. on Sunday, January 6, 2013, a Conmed employee conducted a second medical screening of plaintiff, pursuant to Conmed's "Integrated Intake Screen (Screener)" form ("Integrated Intake Screen"). ECF 128-2 at 8-11. It provided, in relevant part, *id.* at 8 (handwritten notes in italics):

| | Question | Yes | No | Explanation / Response |
|---|---|---|---|---|
| 3a | Does the arresting or transporting officer report or document that arrestee may be suicidal? | | X | If Yes to 3a or 3b, or suspected to be Yes based on behavior, statements and/or history, notify Nurse Immediately for placement on suicide watch. |
| 3b | Does the arrestee report feeling suicidal, thinking of hurting self or unable to control behavior? | | X | |
| 3c | Does the arrestee have a history of actual suicide attempt (within one year or at any time within detention center or prison?) When suicide attempt occurred? | | X | Nurse notified and time: _____ |
| 3d | Does the arrestee report experiencing either auditory or visual hallucinations right now? | | X | If yes for rest of questions (3c-3f), notify Mental Health or Nurse for urgent mental health assessment. |
| 3e | Is arrestee in these suicide risk categories: Juvenile / Murder Charge / Sexual Offense / Prominent Member of the Community? | | X | MHP: _____ |
| 3f | Has arrestee experienced significant loss in past six months or had someone close commit suicide? | | X | Date: _____  Time: _____ |
| 4a | Has arrestee taken prescribed psychiatric medications within 30 Days of Booking? *Aderol* [sic]*, Adatrepalene* [sic] | X | | If Yes, circle which items in Box 4b that apply, notify nursing and mental health for recommendations such as: schedule non-emergent Mental Health Assessment and write medical alert for Mental Health Observation. |
| 4b | Does arrestee have any current mental health complaints, history of treatment for mental illness, history of actual suicide attempt, history of inpatient or outpatient psychiatric hospitalization or history of treatment with medication for mental illness? *ADHD, Bipolar Learning Disab.* | X | | |
| 5 | Is arrestee taking medication for acute or chronic medical or mental health complaints? *Acid Reflux, Clariton* [sic] | X | | If Yes, list and verify medication on page 4 of this form and notify the Nurse. |
| 6 | Does arrestee use prescription narcotics, addictive street drugs or alcohol every day and present with signs or symptoms of intoxication (sweating, tremors, anxious)? *Methadone Detox* [illegible] | X | | If Yes, notify intake RN Immediately to assess need to implement Nursing Assessment Protocols for withdrawal. |

Montgomery was described as "Alert" and his "Behavior" was described as "Appropriate." *Id.* This portion of the Integrated Intake Screen form concludes, *id.* at 9: "Arrestee confirms all intake questions answered truthfully, receipt of information regarding access to health care and consent to healthcare provided by ConMed Healthcare Management, Inc." Montgomery signed this statement on January 6, 2013. *Id.*

Under "Additional Notes" the screener wrote that plaintiff has "3 plates & screws" dating to 2008 and "hx of seizures 1 yr ago." ECF 128-2 at 9. It indicated that Montgomery reported "face" and "stomach" pain (*id.* at 10), although it is not clear whether that pain was the result of an earlier injury dating from 2008. *See id.* at 9-10. Notably, the form does not reflect present injuries to Montgomery, such as "Bruises," "Lacerations," and "Lesions," or symptoms of illness, such as "Tremors," "Nausea," and "Vomiting." *Id.* at 10.

The Integrated Intake Screen makes no mention of Montgomery's Lithium prescription. *See id.* at 7-11. According to Montgomery, however, he "reported being on prescribed medication, including [L]ithium, during this screening, yet [he] was not given Lithium at that time." ECF 141-1 at 4, Opposition Memo. *See* ECF 1 at 2, Complaint.

At 2:15 a.m. on January 6, 2013, shortly after the completion of Conmed's intake screening, Montgomery complained of chest pain. ECF 128-2 at 20. An electrocardiogram[18]

---

[18] An electrocardiogram (EKG or ECG) is a test that checks for problems with the electrical activity of the heart. *See* Entry for Electrocardiogram, Medical Encyclopedia, U.S. National Library of Medicine, https://www.nlm.nih.gov/medlineplus/ency/article/003868.htm (last visited Dec. 3, 2015).

was administered, which indicated normal results, and Montgomery was instructed to return to the health unit if his pain persisted. *Id.* at 20.[19]

Because Montgomery reported that he was using methadone and heroin before arrest (*id.* at 6-7), a detoxification protocol was initiated shortly after intake. *Id.* at 72-73. According to a "Detoxification Referrals Flow Sheet" for Montgomery, which is partially illegible as to the dates and times of observation, Conmed examined or attempted to examine Montgomery six times during January 6 and January 7, 2013. *Id.* at 72. On one occasion, Montgomery refused to be examined. *Id.* Conmed personnel recorded Montgomery's vital signs, including blood pressure, pulse rate, temperature, and blood oxygenation level. *Id.* Notations to Montgomery's medical records indicate that his "Orientation" was "X3." *Id.* With the exception of a "Tremor" on January 6 and again on January 7, 2013, the record shows that, during January 6 and January 7, 2013, Montgomery did not present other symptoms of withdrawal, such as "Ataxia," "Agitation," "Stupor," "Hallucinations," "Vomiting," "ABD Cramps," "Pilo Erection," "Sweating," or "Clonidine / Beta Blockers." *Id.* Conmed's observation of Montgomery continued through the conclusion of the detoxification period on January 10, 2013.[20] *Id.* at 72-73.

---

[19] Montgomery complained again of chest pains and was seen again on January 13, 2013. ECF 128-2 at 17.

[20] On January 8, 2013, and again on January 9, 2013, Conmed's staff appears to have noted elevated blood pressure readings for Montgomery. ECF 128-2 at 73.

At 7:00 a.m. on January 7, 2013, a nurse signed Montgomery's Integrated Intake Screen form and noted the "Final Disposition" as "CW, detox; MH."[21]  *Id.* at 11.  At 7:50 a.m., a "Provider Reviewing Mental Health Information" signed the Integrated Intake Screen form and indicated a need for "further Mental Health Assessment" "w/ MHP w/in 7 days."[22]  *Id.* The form indicates that plaintiff takes "Methodone" and "Aderol" [sic].  ECF 128-2 at 11.  But, it does not mention Lithium.  *Id.*

A "Health Assessment" form, completed at 9:20 a.m. on January 7, 2013, provided further information about Montgomery's condition.  *Id.* at 12.  Although largely illegible, the notations to the form list "ADHD" and "Bipolar" as "Deferred or Abnormal Findings."  *Id.* At 10:54 a.m., Montgomery was "[s]een by MH."  *Id.* at 20.  A short time later, Montgomery signed an Authorization for Release of Confidential Information (Form C-777) to permit Conmed to obtain discharge summary reports, psychiatric summary reports, and medical records from Granite House, a previous medical provider.  *Id.* at 65; *see* ECF 128-3 at 12, Montgomery Interrogatory Answers.

Montgomery's medical records suggest that plaintiff may have attempted suicide during the night of January 7, 2013.  But, the records do not reflect three discrete events, as plaintiff claims.  *See* ECF 128-2 at 19-20.

According to a 10:50 p.m. notation on the "Interdisciplinary Progress Notes" (hereafter "Progress Notes") form for Montgomery, Conmed was notified after a corrections officer heard a "thunk" in Montgomery's cell.  *Id.* at 20.  Montgomery was found on the floor.  *Id.* Corrections

---

[21] I assume "MH" refers to mental health treatment.  From the record, it is unclear to what "CW" refers.

[22] I assume "MHP" refers to a mental health professional.

officers noticed a "make shift noose made of a blanket shredding balled up behind the mattress against the wall appx. 5 ft away" from Montgomery. *Id.* at 19.

Montgomery's vital signs were taken. *Id.* at 20. He had a blood pressure reading of 138/88 and a pulse rate of 70 beats per minute. *Id.* Montgomery also responded to verbal stimuli. *Id.* Red marks were noted on his neck from ear to ear, but not on his head. *Id.* at 19-20. Montgomery, who was able to stand unassisted, helped officers place him in a suicide suit and was put on suicide watch. *Id.* at 19. Plaintiff complained of left arm pain, but was able to move his arms and legs. *Id.* at 20.

Less than one hour later, Montgomery asked why his mental health medications had not been ordered. *Id.* at 19. It was explained to Montgomery that methadone and Adderall are not typically provided at the Detention Center, and that a referral had already been made to a mental health doctor. ECF 128-2 at 19. Montgomery reportedly stated, "fuck this place, I'll let my lawyer know." *Id.*

Conmed personnel attempted to examine Montgomery at 1:00 a.m., 3:00 a.m., and 6:00 a.m. on January 8, 2013. However, Montgomery refused treatment. *Id.* at 25. A notation on January 9, 2013, on Montgomery's "Serial Neurologic Examination (Part II)" form, indicates that at some point Montgomery "changed his mind." *Id.* Indeed, at 7:15 a.m. on January 8, 2013, Montgomery was given a neurological examination. *Id.* at 18-19. The examination showed Montgomery ambulated without assistance and was calm and cooperative. *Id.* Again, redness was noted from ear to ear, but there was no redness on the back of Montgomery's neck or head. *Id.* at 19.

A notation at 10:55 a.m. on January 8, 2013, is reflected on Montgomery's Progress Notes. It states: "Received medication list – reviewed." *Id.* at 18. Another notation to a "Physician's Orders" form for Montgomery shows that he received a 14-day prescription for 450 mg of Lithium beginning at around 11:00 a.m. on January 8, 2013. ECF 128-2 at 23. This was a little more than two days after Conmed conducted its initial assessment of Montgomery. *See id.* at 8-11. At 1:30 p.m. Montgomery was "seen by MH Cont." *Id.* at 18.

A notation to the Progress Notes on January 9, 2013, indicates that Montgomery requested medication for pain and to help him sleep. *Id.* at 18. A ligature mark around his neck was observed from the apparent attempted suicide. *Id.*

According to Montgomery's medical records, Conmed's staff again prescribed Lithium for plaintiff on January 18, 2013 (*id.* at 22) and February 6, 2013. *Id.* at 68. Montgomery's medical records also show that he was prescribed Tylenol and/or Motrin on January 9, 10, and 21, 2013. *Id.* at 22-23.

Summary notations indicate that Montgomery was seen by mental health providers on January 7, 8, 9, 11, 14, 15, 18, 21, 22, February 6,[23] and March 6, 19, 2013. *Id.* at 15-18, 28, 33-35, 37. The assessments, recommendations, and treatments provided by the mental health practitioners are not included in the record.

During Montgomery's treatment, Conmed's staff expressed doubts about the authenticity of Montgomery's suicide attempt. A Mental Health Progress Note dated January 11, 2013, states, in pertinent part, *id.* at 43: "attempted suicide a few days ago - facility is not clear if this is deliberate attempt or manipulative." It also noted that it is "not clear if [Montgomery] is being

---

[23] Montgomery's medical records concerning the month of February 2013 appear to be incomplete.

truthful." *Id.* A Mental Health Progress Note dated January 15, 2013 provides, in relevant part, *id.* at 44: "[A]cknowledgment recent attempt as he explained it was 'out of fear' due to gang affiliation. Notes in the past he 'lied about being suicidal to be in a hospital or get special tx.'"

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. Ltd. v. Zenith, Radio Corp.,* 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see Dulaney v. Packaging Corp. of Am.,* 673 F.3d 323, 330 (4th Cir. 2012).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 514 U.S. 1042 (2004); *see also Celotex,* 477 U.S. at 322–24. In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. Ltd.,* 475 U.S. at 587; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore,* 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion,* 720 F.3d 169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007); *Black v. Decker Corp. v. United States,* 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir. 2002). For example, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See, e.g., Boone v. Stallings,* 583 F. App'x 174, 176 (4th Cir. Sept.11, 2014) (per curiam).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson,* 477 U.S. at 247–48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd,* 718 F.3d 308,

313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

### III. Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law.  *See Baker v. McCollan*, 473 U.S. 137 (1979).  Montgomery asserts violations of his rights under the Eighth Amendment, relating to his claim of inadequate medical care.  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

Conmed contends that summary judgment is appropriate for three reasons.  First, Conmed maintains: "The § 1983 claims against the corporate Defendant, ConMed, Inc., must fail because there is no vicarious liability for alleged § 1983 violations, and Plaintiff has failed to establish any facts that would demonstrate an independent basis of liability as to ConMed." ECF 128 at 1 ¶ 3, Motion.  Second, Conmed maintains that it "is entitled to summary judgment because Plaintiff has failed to designate an expert to establish that the medical conditions he complains of were serious, or that the care provided was inadequate." *Id.* at 1 ¶ 4.  And third, Conmed submits that "the § 1983 claims should be dismissed because Plaintiff failed to establish any facts that demonstrate that ConMed, or any employee of ConMed, was deliberately

indifferent to any serious medical need either through actual intent or reckless disregard, as is required by law." *Id.* at 2 ¶ 5.

Montgomery counters that summary judgment is inappropriate because his "claims are not strictly predicated on vicarious liability." ECF 141-1 at 8, Opposition Memo. He also argues that "[n]o expert should be required" (*id.* at 10) to show that Conmed provided him with constitutionally inadequate medical care. *Id.* at 9-10. Montgomery contends that a question of fact remains as to whether Conmed provided him with inadequate medical care. *See* ECF 141 at 1 ¶ 3, Opposition.

Vicarious liability based on respondeat superior is generally inapplicable to § 1983 actions. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Vinnedge v. Gibbs*, 550 F.2d 926, 927–99 (4th Cir. 1977); *see also Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 691 (1978). However, as I noted in my Memorandum of February 12, 2014 (ECF 48), Montgomery's "claims are not predicated on vicarious liability." *Id.* at 15. Conmed's argument concerning vicarious liability has not improved with age. Montgomery does not argue that an employee of Conmed violated his Eighth Amendment rights and therefore that Conmed is liable. Rather, Montgomery claims that Conmed's conduct violated his Eighth Amendment rights.

"In order to state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A "serious medical need" refers to

a medical need "'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *Farmer v. Brennan*, 511 U.S. at 837; *see Hudson v. McMillan*, 503 U.S. 1, 9 (1992). Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. The Fourth Circuit has "identified two slightly different aspects of an official's state of mind that must be shown in order to satisfy the subjective component in this context.

First, actual knowledge of the risk of harm to the inmate is required. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officers should have recognized it."). As the Fourth Circuit has explained: "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

23

Beyond such knowledge, however, the officer must also have substantially "recognized that his actions" were insufficient to mitigate the risk of harm to the inmate. *Parrish*, 372 F.3d at 303; *see Iko*, 535 F. 3d at 241. In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. It requires proof that the prison official knew of or was aware of the inmate's need for medical attention and disregarded an excessive risk to the inmate's health or safety. *Farmer*, 511 U.S. at 837. Put another way, for liability to attach based on a violation of the Eighth Amendment, the law "requires consciousness of a risk . . . ." *Id.* at 840.

The Fourth Circuit has characterized this as an "exacting standard . . . ." *Lightsey*, 775 F.3d at 178. It explained in *Lightsey* that deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.*

Of course, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. *See Makdessi v. Fields*, 789 F.3d 126, 133, (4th Cir. 2015). And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence . . . ." *Makdessi*, 789 F.3d at 134.

If the requisite knowledge is established, a prison official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Under the Eighth Amendment, "[a] prison official's duty . . . is to ensure

24

"'reasonable safety' . . . ." (citation omitted).  *Id.*  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (*citing Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference[.]"  *Id.* at 166.  Mere negligence or malpractice does not rise to a constitutional level.  *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).  The treatment rendered must be so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness.  *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (recognized in *Sharpe v. S. Carolina Dep't of Corr.*, No. 14-7582, 2015 WL 1500680, at *1 (4th Cir. Apr. 3, 2015) as overruled on other grounds by *Farmer*, 511 U.S. at 837).

Notably, "[a] prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances." *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at *2-3 (D. Md. June 4, 2012) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *see Estelle*, 429 U.S. at 105–06; *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell*, 528 F.2d at 319.  Moreover, inmates do not have a constitutional right to the treatment of their choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986); *see also Hudson*, 503 U.S. at 9 (stating that there is no expectation that prisoners will be provided with unqualified access to health care).  The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of

25

medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977) (emphasis added).

Nonetheless, Conmed is entitled to summary judgment. As noted, the movant seeking summary judgment has the burden of demonstrating the absence of a genuine issue of material fact. *See, e.g., Celotex Corp.*, 477 U.S. at 322-23. Once the movant satisfies its burden, the nonmoving party must come forward to demonstrate the existence of a genuine issue of material fact, such that the case is suitable for trial. *See Matsushita Elec. Indus., Co. Ltd.*, 475 U.S. at 587. To defeat summary judgment, conflicting evidence must give rise to *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247-48.

In this case, there is no genuine dispute between the parties concerning either the course of treatment that Conmed's Manual outlines or the care that Montgomery actually received. As discussed, in his Opposition (ECF 141-1 at 4) Montgomery abandons the allegation in his Complaint that he received no medication for a month. *See* ECF 1 at 2-3. The remaining question is simply whether the care that Conmed provided to Montgomery was constitutionally inadequate.[24]

---

[24] In his Opposition, Montgomery argues that "liability can lie against ConMed where the provision of care is systemically deficient" and argues that "there is a dispute of fact as to whether the adherence to those procedures and protocols has caused constitutional injury . . . ." ECF 141-1 at 9. Montgomery was self-represented when he filed and supplemented his Complaint. *See* ECF 1, 7, 12. But, Montgomery raises allegations about constitutional defects in Conmed's procedures and protocols for the first time in his Opposition. *See* ECF 138 at 1-2, Reply. Even if Montgomery's allegations as to Conmed's policies and procedures were timely, he cannot present claims on behalf of other inmates. Montgomery also must make some showing regarding the appropriate standard of care in order to contradict Conmed's position that its procedures for treatment as well as its medical care were constitutionally sufficient.

As discussed, to state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate (1) that he had a serious medical need; and (2) that the defendant's actions or failure to act amounted to deliberate indifference to a serious medical need.

Conmed and Montgomery dispute whether Montgomery can demonstrate a serious medical need without expert testimony. ECF 128-1 at 13-14, Motion. ECF 141-1 at 9-10, Opposition. I need not decide this question. Even assuming that Montgomery had a serious medical need, the uncontradicted evidence establishes that Conmed's actions and inactions did not rise to the level of deliberate indifference to a serious medical need.

As indicated, deliberate indifference to a serious medical need requires proof that the prison official knew of or was aware of the inmate's need for medical attention and disregarded an excessive risk to the inmate's health or safety. *Farmer*, 511 U.S. at 837. Here, Conmed has introduced, *inter alia*, dozens of pages of Montgomery's medical records from the Detention Center. They show that within a matter of hours after plaintiff's arrival at the Detention Center, which was no earlier than the afternoon of January 5, 2013, both the Detention Center's staff and Conmed's staff assessed Montgomery and consulted with him. Specifically, the Facility assessed plaintiff at about 10:00 p.m. on January 5, 2013. Conmed made another assessment of Montgomery at 1:00 a.m. on January 6, 2013. Several evaluations and interactions followed.

Notably, Conmed's screening questions probed the matter of suicidal behavior with several questions. There is no indication in the record that Montgomery demonstrated any propensity to attempt suicide, or that Conmed had any knowledge about a risk of suicidal behavior. Indeed, in response to the initial medical screening that the Detention Center's staff performed on January 5, 2013, Montgomery said that he had not attempted suicide within the

preceding two years and did not currently entertain suicidal ideations.  Montgomery's alleged

suicide attempt occurred at about 11 p.m. on January 7, 2013.

It is also undisputed that Conmed identified Montgomery's mental health and substance

abuse issues and, shortly after Montgomery arrived at the Detention Center, it initiated treatment,

including detoxification and mental health treatment.  Conmed asked Montgomery about his

prescription medication; obtained Montgomery's consent to contact his health care provider to

verify his prescriptions; and issued a Lithium prescription for Montgomery on the third day of

his incarceration.

Conmed's Manual strengthens Conmed's position.  As discussed, the Manual outlines

detailed policies for assessing and treating inmates with mental illnesses, preexisting

prescriptions, and substance abuse issues.  Notably, Montgomery's medical records reflect that

Conmed's staff complied with Conmed's policies in treating Montgomery.[25]

I am satisfied that Conmed, as movant, has met its burden to demonstrate the absence of a

genuine issue of material fact as to its contention that the care that Montgomery received was not

so deficient as to have violated Montgomery's Eighth Amendment rights.  Therefore, the burden

---

[25] In Montgomery's Interrogatory Answers (ECF 128-3), he asserts that the detoxification
procedure that Conmed's staff followed violated Conmed's policies and procedures outlined in
the Manual because it "involved periodic check-up every six (6) to (8) hours, and did not involve
any apparent kind of medical segregation or hospitalization."  *Id.* at 6 (underlined in original).
Montgomery's Opposition (ECF 141 and ECF 141-1) does not appear to advance this argument.
Regardless, it is unavailing.

The portion of the Manual that Montgomery appears to reference says: "Inmates
suspected of intoxication or withdrawal *may* be observed in their cell, or housed in Medical
Segregation with medical rounds conducted every 15 minutes or more frequently if indicated."
ECF 132-4 at 26 ¶ 4 (emphasis added).  The policy is explicitly permissive and appears within
the context of policy statements that, as noted, provide Conmed's staff with the latitude to tailor
detoxification treatment to an inmate's medical needs.  Moreover, even if Montgomery's
detoxification treatment departed from the treatment that the Manual outlines, Montgomery has
made no showing that the treatment that he received was at all deficient.

shifts to Montgomery to demonstrate a dispute of material fact. Montgomery has not introduced any evidence to show that the care that Conmed provided was in any way inadequate, let alone that it was deliberately indifferent to a serious medical need and thus violated plaintiff's constitutional rights.

Montgomery has not introduced any expert evidence as to the applicable standard of care, so as to establish that the care that Conmed provided fell below what is expected of a health care provider at a detention center. Of course, "mere negligence or malpractice does not violate the Eighth Amendment." *Miltier*, 896 F.2d at 852; *see Estelle*, 429 U.S. at 106.

*Smith v. Atkins*, 777 F. Supp. 2d 955 (E.D.N.C. 2011), is informative because it involves similar factual allegations. There, the court granted summary judgment for defendants as to § 1983 claims alleging, in relevant part, that a medical contractor for a jail had been deliberately indifferent to an inmate's medical needs, resulting in the inmate's death. The *Atkins* Court noted that although the decedent had a lengthy history of mental illness (*id.* at 960-61), he "completed a questionnaire at intake and expressed no hint of suicidal ideation." *Id.* at 964. Moreover, the *Atkins* Court granted defendants' joint motion to strike plaintiffs' expert disclosure for failure to comply with Fed. R. Civ. P. 26. *Id.* at 962-63. And, without expert evidence, the *Atkins* Court concluded that summary judgment for defendants was appropriate as to plaintiffs' claim that a disruption in the decedent's psychotropic medication precipitated his suicide. *Id.* at 966. The court said, in relevant part, *id.*:

> As for the argument concerning [the decedent's] psychotropic medication, simply because a prisoner is prescribed psychotropic medication does not create a substantial risk that an inmate will commit suicide. *See, e.g., Gordon v. Kidd,* 971 F.2d 1087, 1092–95 (4th Cir. 1992). Moreover, plaintiffs have presented no expert testimony concerning the physiological effects of the four prescribed narcotics or the effects of providing only two to [the decedent] or the effects of [the decedent's] failure to take some of his

psychotropic medicine. Without such expert testimony, plaintiffs cannot use evidence associated with [the decedent's] medications to prove deliberate indifference.

To be sure, Montgomery, has a lengthy history of mental illness. But, as in *Atkins*, he exhibited no suicidal propensity upon his admission to the Detention Center. And, Conmed probed the issue of suicidal ideations with plaintiff. Conmed's medical records also reflect that considerable care and attention was devoted to Montgomery. And, like the plaintiffs in *Atkins*, Montgomery has introduced no expert evidence to support his claim that the brief disruption in his psychotropic medication precipitated his alleged suicidal behavior.

The reasoning in *Atkins*, 777 F. Supp. 2d 955, is consistent with the approach taken by at least three circuit courts, including the Fourth Circuit. In *Miltier*, 896 F.2d 848, the Fourth Circuit reviewed the grant of summary judgment for the defendant physicians in a § 1983 claim alleging deliberate indifference to a serious medical need.[26] In *Miltier*, the Court construed *Rogers v. Evans*, 792 F.2d 1052 (11th Cir. 1986), "to stand for the logical proposition that expert exploration is required to aid the jury in determining the threshold standard of medical care." *Miltier*, 896 F.2d at 852. On the other hand, it did not read *Rogers* to require "expert incantation of 'gross indifference' or 'deliberate indifference' before a § 1983 claim against a physician can survive summary judgment." *Id.*

---

[26] The Fourth Circuit observed in *Lightsey*, 775 F.3d at 179: "*Miltier* predates the Supreme Court's decision in *Farmer*, which established the requisite subjective mental state for a deliberate indifference claim." In *Fisher v. Neale*, No. 3:10CV486-HEH, 2011 WL 887615, at *4 n.12 (E.D. Va. Mar. 14, 2011) the court explained: "The Fourth Circuit in *Miltier* defined recklessness in terms of what a defendant actually knew 'or which would be apparent to a reasonable person in the defendant's position.' *Miltier*, 896 F.2d at 851–52. As Judge Payne noted in *Brown v. Mitchell*, however, '*Farmer* [*v. Brennan*, 511 U.S. 828, 114 S.Ct. 1970, 128 L. Ed. 2d 811 (1994)] overruled cases, such as *Miltier*, to the extent that they allowed a finding of deliberate indifference upon constructive knowledge.' 308 F. Supp. 2d 682, 708 n.30 (E.D. Va. 2004)."

Indeed, the Court recognized that expert testimony is not required for a jury to find that certain actions "fell so far below the enunciated standard of care that they constituted gross indifference actionable under § 1983." *Miltier*, 896 F.2d at 852. It added that "expert testimony to the effect that the physicians' behavior was grossly negligent" is unnecessary "as the *sine qua non* of a § 1983 deliberate indifference claim." *Id.* Of import here, however, the Court did recognize the need for an expert to establish the "threshold standard of medical care." *Id.*

The Third and Eighth Circuits take a similar approach. *See Senty-Haugen v. Goodno*, 462 F.3d 876, 890 (8th Cir. 2006) (affirming the grant of summary judgment for defendants concerning a claim by a civilly-committed sex offender for inadequate medical attention under the due process clause of the Fourteenth Amendment and concluding: "Senty–Haugen has failed to present any evidence that the alleged delays in treatment worsened his conditions, however, and he has not provided any expert evidence that the treatment he received was inadequate."); *Alberson v. Norris*, 458 F.3d 762, 765-66 (2006) (affirming the grant of summary judgment for defendants in a §1983 claim alleging deliberate indifference to a serious medical need and concluding: "Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation."); *Montgomery v. Pinchak*, 294 F.3d 492, 504 (3d Cir. 2002) (reversing summary judgment for defendants based on failure to appoint counsel for plaintiff in a § 1983 case alleging deliberate indifference to a serious medical need, but concluding: "It is clear that [plaintiff] himself cannot explain the medical consequences of neglecting to conduct a scheduled cardiac catheterization for a patient with heart disease. Nor can [plaintiff] describe the effects upon the body of being denied, for prolonged periods, prescribed heart and HIV medication. . . . Therefore, we find that to prove

31

any serious deterioration in his heart's condition or in his immune system, [plaintiff] would need the testimony of a medical expert." (citation omitted)).

*Alberson*, 458 F. 3d 762, is noteworthy.  There, the mother of a deceased prisoner brought a § 1983 action against prison officials, alleging deliberate indifference with respect to medical treatment for the prisoner, who died from an illness.  The trial court granted summary judgment to defendants and the Eighth Circuit affirmed.

The appellate court analyzed the claim "as one that the medical treatment . . . was so inadequate as to rise to the level of deliberate indifference." *Id.* at 765.  The majority stated, *id.* at 765-66: "Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation." (Citing *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006).  The Eighth Circuit agreed with the district court that the claim failed for "lack of proof of causation." *Alberson*, 458 F.3d at 766.  It concluded that the plaintiff's "failure to produce expert testimony to prove that a lack of proper medical treatment caused [her son's] death is 'fatal to [her] delibate indifference claim . . . '" *Id.*  Based on "the absence of expert proof of causation," it affirmed the award of summary judgment to the defendants. *Id.*

## IV. Conclusion

Here, Conmed produced medical records showing that plaintiff was promptly evaluated and treated in accordance with Conmed's protocols.  Montgomery has produced no evidence—expert or otherwise—concerning what treatment Conmed failed to provide or why its treatment was not adequate or timely.  Moreover, there is no evidence that the brief disruption in plaintiff's Lithium dosage or an allegedly defective detoxification protocol during the early days of

plaintiff's incarceration was causally related to plaintiff's alleged suicide attempts.  Simply put,

the record does not establish a genuine issue of material fact as to whether Conmed's care and

treatment rose to the level of a constitutional violation.  *See Russell*, 528 F.2d at 319.

For the foregoing reasons, I will grant Conmed's motion for summary judgment.  A

separate Order follows, consistent with this Memorandum.


Date: December 24, 2015

_____/s/_____
Ellen Lipton Hollander
United States District Judge


33